**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **RUTH J. KUZMECH, ET AL,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO.** |
| | : | **3:10-cv-266 (VLB)** |
| **WERNER LADDER COMPANY, ET AL** | : | |
| **Defendants,** | : | **DECEMBER [], 2012** |


**MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTION TO PRECLUDE EXPERT WITNESS [DKT. #57] AND MOTION FOR SUMMARY JUDGMENT [Dkt. #45]**

Before the Court is Defendants Werner Co. (DE)[1] ("Werner") and Lowe's Home Centers, Inc.'s ("Lowe's") motion to preclude Plaintiffs Ruth J. Kuzmech and John Kuzmech's expert witness and motion for summary judgment. Plaintiffs allege that a ladder manufactured by Werner and distributed by Lowe's was defectively designed and sold without proper or adequate warnings, labels and instructions in violation of the Connecticut Products Liability Act ("CPLA"), Conn. Gen. Stat. §52-572m et seq. Plaintiffs also bring claims for breach of express warranty, breach of implied warranty, violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §42-110a, *et. seq.* and loss of consortium on behalf of Plaintiff John Kuzmech. Defendants argue that the Court should preclude the Plaintiffs' expert's testimony as unreliable and that absent expert testimony Plaintiffs' CPLA claims fail as a matter of law as the Plaintiffs cannot demonstrate that the ladder was defective. The Defendants also argue

---

[1] Plaintiffs improperly sued Werner Ladder Company and Werner Company.

that Plaintiffs' other claims are preempted by the CPLA.   For the foregoing reasons, the Court grants both Defendants' motion to preclude and motion for summary judgment.

### Background and Facts

The following background and facts relevant to Defendants' motion to preclude and motion for summary judgment are undisputed unless otherwise noted.  On July 14, 2009, Ruth Kuzmech, age seventy, was using a stepladder to trim hedges along her driveway when both she and the ladder fell to the ground. [Dkt. #45, Defs. Local Rule 56(a)1 Statement, ¶1].  At the time, Ruth Kuzmech was using an eight-foot Werner aluminum stepladder.  *Id.* at ¶2.  Mrs. Kuzmech's son, Clifford Hoxie, purchased the ladder at Lowe's sometime in April 2009, where he was employed, with his employee discount, for Mrs. Kuzmech and her husband, John Kuzmech.  *Id.* at ¶3.  The ladder was a 1-A ladder with a 250 pound duty rating. *Id.* at ¶5.  Hoxie did not observe any damage to the ladder when it was purchased. *Id.* at ¶4.  Mr. and Mrs. Kuzmech did not observe any damage to the ladder when Hoxie presented it to them.  *Id.* at ¶¶9-10.

The ladder at the time of purchase had warning labels on it, including the following: one with duty rating on it, one on the side pertaining to the setup of the ladder, one cautioning to use it only on level surfaces, and one on a top step that advises not to stand beyond that point.  *Id.* at ¶6.

At the time of her fall, Mrs. Kuzmech was trimming the side of the hedges facing her lawn, and the ladder was placed on a grassy dirt surface. *Id.* at ¶11. Mrs. Kuzmech had climbed up to the third rung of the ladder and was trimming

the hedges when she "just went." *Id.* at ¶12.  She doesn't know what happened to cause her to fall.  *Id.*  Mrs. Kuzmech recalls falling over to the left and the next thing she knew she was on the ground.  She lost consciousness for a period of time. *Id.* at ¶13.  When Mrs. Kuzmech regained consciousness, her dog was licking her face.  She observed that one of her legs was sticking through the rungs of the ladder and her other leg was underneath the left front side rail.  She also observed that the ladder was now bent and damaged.  *Id.* at ¶14.

At the time of the fall, the ladder was positioned in an area of a gradual downward slope which Mrs. Kuzmech describes as "not bad."  [Dkt. #55, Pl. Local Rule 56(a) 2 Statement, ¶17].  Mrs. Kuzmech is certain that the ladder's four feet did not move at all.  They did not sink into the ground or come off of the ground, until the moment the ladder fell over. [Dkt. #45, Defs. Local Rule 56(a)1 Statement, ¶18].  Both of Mrs. Kuzmech's hands were holding the trimmers when the ladder fell over.  *Id.* at ¶19.

Mrs. Kuzmech had used the ladder prior to the date of her fall, without incident.  *Id.* at ¶21.  Mrs. Kuzmech's daughter also used the ladder twenty to twenty-five times before without incident.  *Id.* at ¶22.

Plaintiffs allege in their complaint that the ladder was defective in several ways.  First, Plaintiffs allege that the stepladder's rear legs were no longer lined up with the front-legs, leaving the ladder racked and unstable.  [Dkt. #1, Compl., ¶9].  In the racked position, the stepladder had only three legs on the ground, the fourth leg was off of the ground causing the ladder's support to cave in.  *Id.* Plaintiffs also allege that one of the bolts that held the upper frame of the ladder

came out, which contributed to the caving in of the ladder. *Id.* at ¶10.  Plaintiffs also allege that the Defendants breached the express warranty that the ladder was safe for its intended uses and the implied warranty of merchantability because Mrs. Kuzmech was injured as a result of the ladder's defects. *Id.* at ¶¶14-16.  Plaintiffs further allege that Defendants violated CUTPA by failing to correct the defect and to accurately, completely and truthfully warn that the ladder's defects posed a danger to the public at large. *Id.* at ¶30.  Plaintiffs contend that as a direct and proximate result of the deceptive acts or practices of the Defendants, Mrs. Kuzmech suffered severe painful and serious injuries. *Id.* at ¶32. Lastly, Mr. Kuzmech alleges that he has suffered a loss of affection, care, companionship and consortium of his wife as a result of the carelessness and negligence of Defendant Werner. *Id.* at p.17.

Plaintiffs have offered the testimony of Dr. Harold Larson as an expert witness in support of their opposition to Defendants' motion for summary judgment.  Based on the testimony of Dr. Larson, Plaintiffs contend in opposition to summary judgment that the ladder was defectively designed such that the diagonal strut which connects to the side rail was not strong enough to support the load of the ladder during a reasonably foreseeable use and such that the diagonal strut should have connected to the side rail at a lower point, offering more support for the load of the ladder.  [Dkt. #55, Pl. Local Rule 56(a) 2 Statement, Disputed Issue of Material fact, ¶¶1-2].

Dr. Larson is a metallurgical engineer.  He holds a bachelors of science in chemical engineering from Tufts University and a doctorate in metallurgy from

the Massachusetts Institute of Technology ("MIT"). [Dkt. #62, Ex. A, Larson CV]. He was employed as a Superintendent of Process Metallurgy Research by ASARCO INC. from 1966-1980. *Id.* After ASARCO, Dr. Larson worked as a Manager of Metals Research and Headquarters Staff Engineer at Exxon Mineral Company from 1980-1984 and then as a General Manager and Director of Engineering at Prototech Inc. from 1984-1988. *Id.* From 1989-2006, Dr. Larson was employed as a Research Associate at MIT and then as a Research Affiliate at MIT from 2006-present. *Id.* Dr. Larson has authored several peer reviewed articles in the fields of chemical and metallurgical engineering. Dr. Larson is not a licensed engineer in any state.

Dr. Larson's expert report submitted pursuant to Fed. R. Civ. P. 26(a)(2) consists of a four paragraph letter dated September 7, 2011 addressed to Plaintiffs' counsel. In that letter, Dr. Larson writes:

> I have examined the incident Ladder which you delivered to me. Mrs. Kuzmech's sworn deposition establishes that the ladder was set up properly, the side braces were engaged, and the ladder was on stable relatively flat ground. She climbed up to the ladder to only the third step from the bottom and reached over the top of the ladder to trim her bushes. Therefor her center of mass was always between the side rails of the ladder. Her weight was well below the weight rating of this ladder.

> The ladder failed and collapsed sideways when the left front rail buckled and folded inward. The ladder was being used properly, therefore the ladder failed. The step ladder is made of extruded Aluminum alloy. There are four diagonal Aluminum support struts riveted to each of the bottom three steps of the ladder to stiffen and strengthen it. In this failure the two support struts between the bottom step and the left rail failed by buckling. Of these, the rear strut buckled the most. Once the struts bent, they could not support or stiffen the left rail and strut. The root cause of the collapse of the ladder was the buckling of the lower rear support strut. This is a flimsy, poorly designed ladder and failure was foreseeable.

The weakest components of the design were the lower support struts which failed.   At minimal or no extra cost a light gage extrude channel piece could have been substituted for the two struts on each side.  The channel geometry would provide much greater resistance to buckling.  In addition, the connection points on the side rails would perform better if they were closer to the foot of the ladder.  A ladder with these simple modifications, likely would not have failed.   A company interested in consumer safety would recall this model ladder and make these changes.

In my opinion, with a reasonable degree of engineering certainty, the incident ladder failed because it was poorly designed and defective for its rated service.
[Dkt. # 57, Att. 1, Ex. A].

Defendants have submitted a complete copy of Dr. Larson's deposition transcript for this Court's review.  Dr. Larson testified that while he doesn't claim to be a ladder expert nor has he designed a ladder, he has examined and worked on several ladder cases in collaboration with MIT Professor Tom Eagar.  [Dkt. #57, Ex. B., Larson Dep., p. 30-32].  In those past cases, Dr. Larson has completed testing on ladders including determining the kind of force it takes to break something loose on the subject ladder as well as some "analytical work on the type of aluminum from an aluminum ladder, hardness measurements, chemical analysis, SEM work, and grain structure measurements."  *Id.* at 32-33.

Dr. Larson testified that he did not undertake any testing on the ladder at issue in this case and that "all I've done is a visual inspection" of the ladder.  *Id.* at 34.  He testified that he did not take any measurements that he recorded and kept but used a micrometer to measure wall thickness to get a rough judgment on the various strengths of various components.  *Id.* at 45.   He also took a tape measure and measured the distance between the various steps on the ladder.  *Id.* at 48.  Dr. Larson did not ask for any design drawings before he prepared his

report nor did know whether the measurements he made met manufacturing specifications. *Id.* at 47-48.

Dr. Larson testified that he observed several deformations of the ladder during his visual inspection which he deemed to be significant. He testified that "I would place a lesser level of significance on the side brace that broke fee from one leg. I don't think that was causative. I think that was post event but not an initiator. To me the main damage I saw on the bottom left front rail which had buckled and the support struts or brackets that go between that rail and the lowest step of the ladder." *Id.* at 51. Dr. Larson also indicated that one end of one of the spreader bars had pulled loose from the rail and bent which in his opinion was the result of the accident and not its cause. *Id.* at 52. Dr. Larson did not take any measurement of any of the deformations to the ladder. *Id.* at 54.

Dr. Larson indicated that it was his belief that had the diagonal struts not bent the side rail would not have bent. *Id.* at 69. Dr. Larson testified that he did not "attempt to quantify what forces are required to cause this type of deformation to the ladder components given the set up and use of the ladder at that time." *Id.* He stated that "it's testing that could be done. I've not been requested to do that." *Id.* Dr. Larson explained "[o]ne thing that I would [have] like[d] to test that could be tested would be what I'm calling the strut, the knee brace, could test that as to what force does it take compression to get it to buckle. That knee brace is made out of 14 gage steel, has a dimple in it, if you would, which strengthens it somewhat but is almost 10 inches long and is subject to buckling…There is an issue of the thickness of the material and length of the

material.   If the length of the material is over 50 times the thickness of the material it's prone to buckling.   That would be the case here.   If it's short and stubby, if it was either less length or more thickness to it, it would not have buckled."  *Id.* at 70- 71.

Dr. Larson testified that "I believe the design of the whole ladder is – I use the word flimsy.   That includes that left side rail ... You want a ladder to be the lightest weight possible and just strong enough to do the job.   Both side rails could have been made out of stronger material generally thicker...and that to make this ladder non-defective [they should] make the strut stronger and [] move the connection point of the strut to the side rail lower."  *Id.* at 77-78.  Dr. Larson attested that he did not make any drawings of such an alternative design nor did he create any sketches.  *Id.* at 78-79.  When asked if his opinion was untested and subjective based on the accident that was described by the Plaintiff, he answered that "[t]his is an educated opinion.   It's unsubstantiated." *Id.* at 79.   He once again indicated that he did not do any calculations in connection with his opinion. *Id.*

Dr. Larson also explained that in his opinion the strut should have been made out of a channel configuration as opposed to the configuration that it was. *Id.*  Dr. Larson brought to the deposition a U shaped channel made out of aluminum that he explained would be close to the size and the shape of his proposed design alternative.  *Id.* at 79-80.   Dr. Larson purchased this piece of aluminum which was commercially available.  *Id.* at 130.  Dr. Larson testified that the channel he brought is an example of the concept of the alternative design but

that he did not do "any drawings, sketches, calculations or any other work to transform that alternative design concept into any type of prototype that could actually be used with that ladder" although he indicated that it would "not [be] difficult to do" so. *Id.* at 80.

Although Dr. Larson admittedly did not build any prototype or do any calculations such as to determine the load bearing characteristics of the alternative diagonal brace he proposed, he explained that he could demonstrate his design concept with cardboard. *Id.* at 81-83. At his deposition, Dr. Larson used cardboard to demonstrate that a U shape is stronger and less prone to buckling. *Id.* at 83-84.

When asked "is there any testing of the ladder as a whole that you could envision that could be done to test your opinion that the left front rail and diagonal braces were bent by normal loading within the center of gravity of the ladder with the ladder placed on a firm level surface," Dr. Larson indicated that "[t]here are tests that could be done. But I would not expect it to fail those tests…[b]ecause a normal loading of a ladder straight down would tend to cause the legs to buckle outward. This leg buckled inward." *Id.* at 71-72. Dr. Larson indicated that his opinion was not premised on the assumption that the ladder was on a firm surface and the forward force consisted of the Plaintiff and the hedge trimmer as Plaintiff had testified. *Id.* Instead, Dr. Larson explained that he had "a couple of hypotheses, certainly not prove, a couple of things that could cause the failure" which he did not include in the report. *Id.* at 72. Dr. Larson further explained that a "person is not necessarily stationary with straight down

forces.  But they could be a body moving side to side that can put additional horizontal forces on the ladder.  There can be some racking or twisting of the ladder that occurs."  *Id.* at 74.

Dr. Larson opined that in order for the inward buckling to have occurred there must have been horizontal force on the ladder despite the fact the Plaintiff has testified that she was centered on the ladder on essentially flat ground.  *Id.* at 84.   Dr. Larson explained that he had a couple of hypotheses as to how there could be lateral movement when Plaintiff didn't do anything to tip the ladder to one side or the other.  *Id.* at 86.  He declared that "I have, as I said previously, a couple of hypotheses that would cause that to happen, neither one of which I can prove.  There is no evidence that I'm aware of."  *Id.* at 84-85.  "One hypothesis we know there was a dog in the yard.  If Ms. Kuzmech is standing on the third step of the ladder and the dog comes and jumps onto the ladder, the side of the ladder, puts his paws up against it, he can create just the direction and type of force that is needed to cause the buckling.  I don't know that happened.  It's just a hypothesis."  *Id.* at 85-86.   Dr. Larson admits that he did not attempt to quantify the force that would be at play in this hypothesis. *Id.* at 86.   His second hypothesis "which has to do with the buckling of the strut is that while the ladder is on its side either in storage in the storage shed or possibly even when it was in the store before it was purchased somebody could have inadvertently kicked against the strut.  It could happen… I think it's possible that a strut was damaged before the ladder was used."  *Id.* at 87.

Dr. Larson agrees that "if the ladder was set up on relatively firm level ground and a person such as the Plaintiff having her body centered between the rails that an inward buckling of one of the front legs is not to be expected" and that ""unless one of [his] two hypotheses or some other manner that [he] can't envision currently was in place, then [he] can't envision how the inward buckling would occur given the stated use of the ladder." *Id.* at 88-89. "For the buckling to have occurred in this case given the Plaintiff's stated use of the ladder" there must have been "some other force to cause the inward buckling."

Dr. Larson agrees that "if someone reached far enough outward to the left or the right to cause a ladder to tip over that that force would also cause a leg to buckle." *Id.* at 94. Dr. Larson also agrees that if the ladder "simply tipped over for whatever reason, whether it's because it was on a slope, whether it was because the Plaintiff lost her balance for whatever reason, if the ladder simply tipped over and the Plaintiff fell on it" her body weight could cause the buckling of the left rear rail. *Id.* at 96. Although Dr. Larson points out that Mrs. Kuzmech testified that when she regained consciousness the ladder was on top of her. *Id.* at 97.

Dr. Larson further testified that he believed that the side braces were flimsy and the side rails were of the absolute minimum thickness to function and should be heavier but neither of these two weaknesses contributed to the accident. *Id.* at 98-99. Dr. Larson attested that he did not consult with anybody regarding his work on this case nor was his work reviewed by any other engineer or scientific expert. *Id.* at 104. Lastly, Dr. Larson attested that he isn't familiar with any

literature or materials in the public domain that speak directly to ladder design or manufacture although he is aware those sources exist.  *Id.* at 107-108.

## A. Motion to Preclude

Federal Rule of Evidence 702 provides: A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

"District courts have a 'gatekeeping' role under Federal Rule of Evidence 702 and are charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Lynch v. Trek Bicycle Corp.*, 374 F. Appx. 204, 206 (2d Cir. 2010) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 265 (2d Cir. 2002)).  "The district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered.  This inquiry is conducted with reference to Rule 702, and involves considering whether (1) the testimony is grounded on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case."  *Id.*  (internal quotation marks and citations omitted).

"While the *Daubert* inquiry is fluid and will necessarily vary from case to case, the Supreme Court in *Daubert* identified factors bearing on reliability that district courts may consider: "(1) whether a theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation, and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.  However, nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Id.* (internal quotation marks and citations omitted).  "The burden is on the party proffering the expert testimony to lay a foundation for its admissibility."  *Smith v. Herman Miller, Inc.*, No.CV-03-5358 (CPS), 2005 WL 2076570, at *2 (E.D.N.Y. Aug. 26, 2005).

Defendants argue that the Plaintiffs should be precluded from offering Dr. Larson's testimony and report because his opinions have not been subjected to scientific method, are not reliable and express a legal conclusion.   Defendants also appear to suggest that Dr. Larson is not qualified to testify concerning the appropriate design of ladders.  Defendants point out that Dr. Larson is not a professional licensed engineer, has never designed a ladder, is admittedly not a ladder expert and billed very few hours on this case.  [Dkt. #57, p. 11-12].  "A court must consider the 'totality of a witness's background when evaluating the witness's qualifications to testify as an expert.'"  *Smith*, 2005 WL 2076570, at *3 (quoting 29 Wright & Gold, Federal Practice and Procedure § 6265, at 246 (1997)).

"An expert must be limited to opinion testimony in the area of expertise in which the proffering party can qualify the expert." *Id.*  Although Dr. Larson is not a ladder designer, Rule 702 does not require expertise to be so exacting.  Rule 702 requires a witness only be qualified by knowledge, skill, experience, training or education and permits that witness to testify if that expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.  Here, Dr. Larson's extensive education and research background in metallurgy and engineering more than indicate that he is qualified to opine on whether the aluminum ladder in this case was defectively designed and that his opinion is being offered to help the trier of fact determine the central fact in issue in this case.  The fact that Dr. Larson was not a ladder designer or ladder expert goes only to the weight of his testimony not his qualifications.

Although Dr. Larson is qualified by experience, training and education, his testimony is neither grounded on sufficient facts or data, the product of reliable principles and methods nor is there any indication that Dr. Larson applied those principles and methods reliably to the facts of this case.  Moreover, the Plaintiffs had failed to satisfy any of the four factors identified in *Daubert* with respect to Dr. Larson's testimony.  Dr. Larson's conclusions that the ladder was defective are based on nothing more than his cursory visual inspection of the ladder and rough measurements.  Dr. Larson admittedly did not undertake any testing of the defective ladder despite acknowledging that such testing was not only feasible but not difficult to accomplish.  Indeed, Dr. Larson noted that in past ladder cases

he has done such analytical work including hardness measurements, chemical analysis, SEM work, and grain structure measurements.  In fact, Dr. Larson testified that he would have liked to have done some testing in this case on the diagonal knee brace to determine what compressive load caused buckling but had not been requested to do so.  In both his report and his deposition testimony, Dr. Larson fails to identify what principles and methods he relies upon in coming to his conclusions besides his conclusory statement that such conclusions were based on a "reasonable degree of engineering certainty."  As the Supreme Court has made clear "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Without any explanation of the reasoning, any calculations or other type of scientific evidence supporting Dr. Larson's conclusions, his testimony is opinion evidence that is mere *ipse dixit* of the expert.  See *Smith*, 2005 WL 2076570, at *4 (holding that "lack of calculations, alternative design, testing, or supporting research material renders it nearly impossible to discern precisely what [the expert's] methodology in coming to his conclusion was.  The expert report consists almost exclusively of his observations concerning the physical characteristics of the chair without supporting measurements, and the conclusion that the chair could not withstand a rocking motion … leav[ing] the Court with mere *ipse dixit*, or say so of the witness.") (internal quotation marks and citations omitted).

Another district court in this circuit has cogently explained that expert testimony should be precluded where there is no indication in the expert report "of the engineering protocols and methods" employed "in arriving at the normative conclusions embodied within the claims." *Borgonone v. Trump Plaza*, No.98-CV-6139(ILG), 2000 WL 341135, at 5* (E.D.N.Y. Mar. 9, 2000).  In *Borgonone*, the plaintiff's expert opined that the shower in the defendant hotel was "very slippery" and "excessively sloped."  The *Borgonone* court noted that although "[c]ivil engineers presumably have objective methods and scientific standards that may be brought to bear in the assessment of such familiar, lay categories as the "slipperiness" of tile flooring, or the construction of shower stalls with tiered floor levels," the expert made "no mention of these methods or standards in opining on these matters, appearing to rest solely on his laurels as a civil engineer, whose opinions just by virtue of that fact are admissible as relevant expertise."  *Id.*  The *Borgonone* court therefore concluded that "this manner of proceeding is precisely what *Daubert* … will not countenance.  An expert, regardless of how sterling his credentials, must make clear in his proffer the methods and standards he proposes to apply in arriving at his opinions and evaluations, and must make clear in doing so that those methods and standards are reliable, and subject to objective evaluation by the expert's peers."  *Id.*  Here as was the case in *Borgonone*, Dr. Larson fails to proffer the methods and standards he proposes to apply in arriving at his normative conclusions that the ladder was "flimsy" and "poorly designed" nevertheless demonstrate that those

methods and standards were reliable.  Instead, Dr. Larson appears to rest on his laurels as an MIT metallurgist.

Courts have also "repeatedly emphasized the importance of having an expert in a product liability case perform appropriate tests on his and the defendant's designs." *Smith*, 2005 WL 2076570, at *4 (collecting cases).  The importance of testing both an expert's theory of causation and alternative design "is usually critical to show that an expert adhere[d] to the same standards of intellectual rigor that are demanded in their professional work" and "ensures that the focus of the jury's deliberation is on whether the manufacturer could have designed a safer product, not on whether an expert's proposed but untested hypothesis might bear fruit."  *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F.Supp.2d 53, 76-77 (S.D.N.Y. 2001) (internal quotation marks and citation omitted).  Indeed the Second Circuit has acknowledged that expert testimony regarding a safer alternative design should be excluded where the expert fails to conduct any testing, perform calculations or create drawings and testimony regarding a theory of causation should be excluded absent testing.  *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004) ("Numerous courts have excluded expert testimony regarding a safer alternative design where the expert failed to create drawings or models or administer tests.") (collecting cases); *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000) ("The failure to test a theory of causation can justify a trial court's exclusion of the expert's testimony."); *see also Rabozzi v. Bombardier, Inc.*, No. 5:03-CV-1397 (NAM/DEP), 2007 WL 951569, at *6 (N.D.N.Y. Mar. 27, 2007) (excluding expert report where report failed to

explain reasoning or calculations behind expert's opinion and failed to test proposed design "much less built and tested a prototype."). "This is not to say that testing of alternative designs is always necessary. An expert may, in some cases, provide drawings and calculations that would allow a trier of fact to infer that his theory that the [product] was defective and that alternative designs would have prevented the accident without sacrificing utility were supported by valid engineering principles." *Smith*, 2005 WL 2076570, at *4 (internal quotation marks and citations omitted). It is undisputed that Dr. Larson did not build a prototype, create any drawings or sketches, or perform any calculations or conduct testing on his alternative design nor did he test any of his theories of causation. The fact that Dr. Larson did demonstrate at his deposition that a U shape design is stronger with some cardboard and brought to his deposition a U shaped aluminum channel rod similar in size and shape to his proposed design concept fall far short of a comprehensive drawing or sketch supported by calculations that would allow a trier of fact to infer that his theory that the ladder was defective and his alternative design would have prevented the accident were supported by valid and reliable engineering principals and methods.

The Second Circuit has also emphasized that district courts are not required to accept an expert's testimony regarding speculative and untested theories concerning the cause of an accident in a products liability case. *Lynch*, 374 F. Appx. at 206. In *Lynch*, the Second Circuit affirmed the district court's decision to preclude an expert who testified how the product failure could have happened to his untested conjecture and to how certain testing might be

conducted as unreliable under Rule 702 and *Daubert* factors.  *Id.*  In the instant case, Dr. Larson admits that his theories as to the cause of accident are untested and unsubstantiated hypotheses.  He speculates that the inward buckling on the ladder might have been caused by a dog jumping on the ladder or by pre-existing damage that occurred sometime during storage.  Dr. Larson repeatedly testified that these two hypotheses were unsubstantiated and could not be proved as he was aware of no evidence to support them.  It is axiomatic that expert testimony "'must be based on actual knowledge and not subjective belief or unaccepted speculation.'"  *Smith*, 2005 WL 2076570, at *4 (quoting *Mitchell v. Gencorp, Inc.,* 165 F.3d 778, 780 (10th Cir.1999)).

Because Dr. Larson fails to identify the engineering protocols or methods he employed to arrive at his conclusions, this Court cannot find that his testimony satisfies the *Daubert* factors which ask the Court to examine the reliability of those protocols and methods.  Here, Dr. Larson has not tested his design; neither his design nor the theory or technique behind the design has been subjected to peer review or publication; there is no known rate of error because his design has not been tested; and Dr. Larson has not shown that his design or the theory or technique behind the design has gained general acceptance in the relevant scientific community.   In sum given Rule 702 factors and the *Daubert* factors bearing on reliability, this Court finds it appropriate to preclude Dr. Larson's report and testimony as unreliable and therefore inadmissible under Rule 702.

The Court notes that Dr. Larson's "report" also fails to meet Rule 26 of the Federal Rules of Civil Procedure's requirements concerning expert reports. Although the inquiry under Rule 26 is distinguishable from Rule 702, the fact that Dr. Larson's report also fails to meet Rule 26's threshold underscores the conclusion that his testimony is insufficient under Rule 702.  "Rule 26 guards against the presentation of sketchy and vague expert reports that provide little guidance to the opposing party as to an expert's testimony, Rule 702 guards against the presentation of insufficiently reliable evidence to the finder of fact." *Conte v. Newsday, Inc.*, No. CV 06–4859(JFB)(ETB), 2011 WL 2671216, at *4 (E.D.N.Y. July 7, 2011) (citation omitted).  Rule 26 requires that an expert report contain "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; [and] (iii) any exhibits that will be used to summarize or support them." Fed. R. Civ. P. 26(a)(2)(B).  Rule 37(c)(1) provides that a party who fails to provide information required by Rule 26(a) is not permitted "to use that information ... to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  "The Advisory Notes to Rule 26 make clear that subsection (a)(2) (B), added as part of the 1993 amendments to the Federal Rules, requires that an expert "prepare a detailed and complete written report, stating the testimony the witness is expected to present during direct examination, together with the reasons therefore."  *Jinghong Song v. Yao Bros. Grp. LP*, No. 10 Civ. 04157(RKE), 2012 WL 1557372, at *1 (S.D.N.Y. May 2, 2012) (internal quotation marks and citation

omitted); *see also Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir.1998) ("Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions."); *Koppell v. New York State Bd. of Elections*, 97 F.Supp.2d 477, 481 (S.D.N.Y. 2000) (excluding expert report because defendants "failed to provide sufficiently detailed information regarding the bases of [the expert's] opinion.").  As discussed above, Dr. Larson's four paragraph "letter-report" does not provide a complete statement of the basis and reasons for his conclusions nor does it adequately identify the facts and data considered.   Dr. Larson's bald conclusions that the ladder was "flimsy, poorly designed," "failure was foreseeable" and that at little to no extra cost a channel piece could have been substituted to provide "much greater resistance to buckling" fail to indicate how and why  Dr. Larson reached these conclusions.  Moreover, Dr. Larson's deposition testimony fails to cure any of the deficiencies of his "report."   Although not raised by Defendants, Dr. Larson's report would also be subject to exclusion based on Rule 26 and  Rule 37(c)(1) .  For the all of the aforementioned reasons, the Court grants Defendants' motion to preclude and will not consider Dr. Larson's testimony as part of the record on Defendants' motion for summary judgment.

### B.  Motion for Summary Judgment

#### Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Fed.R.Civ.P. 56(a). The moving party bears the burden of

proving that no factual issues exist. *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir.2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.,* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir.2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D.Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record,

summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

<u>Analysis</u>

i.      **CPLA Claim**

"The CPLA, enacted in 1979, was intended to merge the various common law theories of products liability into a single cause of action in order to simplify pleadings and procedures.  However, the CPLA certainly retains the plaintiff's right to allege the traditional theories of recovery along with the statutory basis for recovery under one unified count denominated as a product liability claim." *Moss v. Wyeth Inc.*, No.3:04cv1511(SRU), 2012 WL 1899876, at *2 (D.Conn. May 24, 2012) (internal quotation marks and citations omitted).

"Connecticut law provides for civil damages actions grounded in strict liability for defective products."  *Id.* (citing Conn. Gen. Stat. §52-572n).  "In general, Connecticut courts have adopted the strict liability test established in section 402A of the Restatement (Second) of Torts.  Section 402A imposes liability only when the product is 'unreasonably dangerous' to the ordinary consumer who purchases it." *Id.* (citing *Garthwait v. Burgio,* 153 Conn. 284, 289–90 (1965) and *Potter v. Chicago Pneumatic Tool Co.*, 241 Conn. 199, 211 (1997) (quoting § 402A, cmt. (i))). "A product may be defective due to a flaw in the manufacturing process, a design defect or because of inadequate warnings or instructions." *Vitanza v. Upjohn Co.,* 257 Conn. 365, 373 (2001).  A manufacturing defect "is a mistake in the assembly process, which results in a product that differs from the manufacturer's intended result." *Moss*, 2012 WL 1899876, at *2.  A

design defect "exists when the product is otherwise properly manufactured, but is nonetheless unreasonably dangerous because its attributes can cause unexpected injury" while a "warning defect exists when a product is unreasonably dangerous because it lacks adequate warnings or instructions concerning the product's dangerous propensities." *Id.*

"In order to recover under the doctrine of strict liability in tort the plaintiff must prove that: (1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition." *Giglio v. Connecticut Light & Power Co.*, 180 Conn. 230, 234 (1980). "A product is unreasonably dangerous if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it … Proper warnings, however, may prevent a product from being unreasonably dangerous." *Vitanza*, 257 Conn. at 835-36 (internal quotation marks and citations omitted). "In a products liability action, the plaintiff must plead and prove that the product was defective and that the defect was the proximate cause of the plaintiff's injuries." *Haesche v. Kissner*, 229 Conn. 213, 218 (1994) (internal quotation marks and citation omitted).

Defendants argue that without any expert evidence Plaintiffs cannot establish a genuine issue of material fact in dispute that the ladder was unreasonably dangerous.  As the Second Circuit observed the "Connecticut

Supreme Court has made it clear that in product liability actions, 'a jury may, under appropriate circumstances, infer a defect from the evidence without the necessity of expert testimony.'"  *Sanders v. Fireline, Inc.*, 295 F. Appx. 373, 374 (2d Cir. 2008) (quoting *Potter v. Chicago Pneumatic Tool Co.*, 241 Conn. 199, 218 (1997)).  "Expert testimony is unnecessary 'if all the primary facts can be accurately and intelligibly described to the jury, and if they ... are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation.'" *Id.* (quoting *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962)).  "'Where, however, the nexus between the injury and the alleged cause would not be obvious to the lay juror, expert evidence is often required to establish the causal connection between the accident and some item of physical or mental injury.'" *Id.* (quoting *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004)).

Courts have recognized that "[p]utting forth expert testimony or evidence of some kind to establish a genuine issue of material fact is especially important when, as is the case here, the plaintiff attempts to assert a design defect claim." *Walters v. Howmedica Osteonics Corp.*, 676 F.Supp.2d 44, 50 (D. Conn. 2009); *Koger v. Synthes North America, Inc.*, No. 3:07–CV–01158 (WWE), 2009 WL 5110780, at *2 (D. Conn. Dec. 17, 2009) (holding that since implanted medical screws was not a subject matter within common knowledge plaintiff needed expert evidence to establish screw was defective and the existence of a causal link); *Graham v. Fireline, Inc.*, 3:03CV00990 (AWT), 2006 WL 1646165, at 6 (D.

Conn. June 14, 2006) ("Expert testimony with reference to proximate causation is not always required .... for example, when a jury could find proximate causation from its consideration of ... the [product] and the plaintiff's description of how the accident happened. However, an expert opinion as to proximate causation "is required[ ] when the subject-matter to be inquired about is presumed not to be within common knowledge and experience and when legal inference predominates over statement of fact.") (internal quotation marks and citations omitted); *Simjian v. Bayer Corp.*, No. 3:10–CV–1263 (RNC), 2012 WL 1194283, at *1 (D. Conn. April 10, 2012) ("A defendant in a products liability may be entitled to judgment as a matter of law when the plaintiff lacks admissible expert testimony on the issue of causation.").

Here given that the Plaintiffs' CPLA claim turns on the physical conditions and engineering principles of when a ladder buckles, the jury is not as capable as an expert witness in "comprehending the primary facts and of drawing correct conclusions from them." *Sanders*, 295 F. Appx. at 374 (internal quotation marks and citations omitted).  Expert evidence is necessary because the engineering principles behind ladder buckling are clearly not within common knowledge. Moreover the causal nexus between the injury and the claimed defects would not be obvious to a lay juror.  In fact they are not obvious to the Plaintiff's experts who posits alternative theories for the ladder collapse other than an inherent defect.  Because this Court has excluded Plaintiffs' expert for the reasons discussed above, the Plaintiffs have failed to proffer admissible expert evidence

to establish a genuine issue of material fact as to their CPLA claim.  The Court therefor grants summary judgment on Plaintiffs' CPLA claim.

ii.      Breach of express and implied warranty

Defendants argue that Plaintiffs' breach of express and implied warranty claims fail as a matter of law as the CPLA provides the Plaintiffs with their exclusive remedy.  The CPLA creates a consolidated cause of action for all product liability claims, which "shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product."  Conn. Gen. Stat. §52-572n(a).  "Although the CPLA provides the exclusive remedy for product liability claims, it was not meant to alter the substance of a plaintiff's rights and it does not preempt all common law theories of product liability; rather, the CPLA bars separate common law causes of action in product liability cases."  *Fraser v. Wyeth, Inc.*, 857 F.Supp.2d 244, 252 (D. Conn. 2012).  "A plaintiff bringing a cause of action under the CPLA therefore retains the right to allege traditional theories of recovery under one unified CPLA claim" like breach of express and implied warranty.  *Id.*  Therefore although the Plaintiffs pled their breach of warranty claims as separate counts, the Court will treat those claims as a single cause of action under the CPLA with multiple theories.  "Such sub-claims are addressed independently, and retain their character as they existed at common law even when brought as a single CPLA claim."  *Certain Underwriters, Subscribing To Policy Numbers DG055707, DG061908, 4N65010001*, No.3:10-cv-00915(VLB), 2011 WL 1217169, at *6 (D. Conn. Mar. 30, 2011).  Therefore the Court will examine whether there is a genuine issue

of material fact in dispute as to whether Defendants breached either the express or implied warranty.

Courts have held that "because the CPLA is silent as to the elements of a cause of action for breach of warranty," plaintiffs may rely on the Connecticut Uniform Commercial Code, Title 42a of the Connecticut General Statutes ("CUCC"). *Walters*, 676 F.Supp.2d at 55; *Johnson v. Sears Roebuck & Co.*, No.3:05-cv-139(JCH), 2007 WL 2491897, at *4 (D. Conn. Aug. 29, 2007). "The CUCC defines implied warranties in two provisions. Connecticut General Statute section 42a-2-315 provides: '[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under section 42a-2-316 an implied warranty that the goods shall be fit for such purpose.'" *Walters*, 676 F.Supp.2d at 55 (quoting Conn. Gen. Stat. §42a-2-315). "Connecticut General Statute section 42a-2-314 provides: '[u]nless excluded or modified as provided by section 42a-2-316, a warranty that the goods shall be merchantable is implied in a contract with respect to goods of that kind.'" *Id.* (quoting Conn. Gen. Stat. §42a-2-314). "This implied warranty of merchantability 'acts as a guarantee by the seller that his goods are fit for the ordinary purposes for which they are to be used and will pass in the trade without objections.'" *Id.* (quoting *Blockhead, Inc. v. Plastic Forming Co., Inc.,* 402 F.Supp. 1017, 1025 (D.Conn.1975)).

An express warranty is defined under Conn.Gen.Stat. § 42a-2-313(1) as: "(a) Any affirmation of fact or promise made by the seller to the buyer which relates to

the goods and becomes part of the basis of the bargain, creates an express warranty that the goods shall conform to the affirmation or promise. (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description. (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the good shall conform to the sample or model." Conn.Gen.Stat. § 42a-2-313(1); *Johnson*, 2007 WL 2491897, at *4.

"For both express and implied warranties, a plaintiff has the burden of proving causation." *Johnson*, 2007 WL 2491897, at *4 (citing Conn.Gen.Stat. § 52-572n(a)); *Blockhead,* 402 F.Supp. at 1024 ("In a breach of warranty action, a plaintiff may recover only after demonstrating that a warranty existed, that defendant breached the warranty, and that the breach was the proximate cause of the loss sustained.").

As Defendants argue there is no record evidence in this case that the ladder in question was unfit for its known or ordinary purpose. As discussed above, Plaintiffs have failed to offer any admissible expert evidence to support the conclusion that the ladder was defective or unfit for its ordinary or known use. Furthermore, Plaintiffs fail to provide evidence that the alleged injuries were caused by the ladder being unfit for its purpose. Plaintiffs have therefore failed to establish a material issue of fact in dispute as to breach of implied warranty. There is likewise no evidence that Defendants breached any express warranty as Plaintiffs have failed to demonstrate that the ladder was defective and have failed to present any evidence that such breach was the proximate cause of the loss

sustained.   Plaintiffs' claims for breach of express and implied warranty are directly premised on the alleged ladder's defects.  Because Plaintiffs have failed to create a genuine issue of material fact in dispute as to the ladder's defects, they likewise cannot create a genuine issue of material fact in dispute as to either their breach of express or implied warranty claims.  Plaintiffs therefore fail to set forth any facts demonstrating a genuine issue for trial with respect to these claims and the Court grants summary judgment.

   iii.   **CUTPA**

   The Plaintiffs have argued that the Defendants have violated CUTPA by attaching inaccurate and deceiving warning labels on the ladder.   Defendants argue that the Plaintiffs' CUTPA claims fail as a matter of law as the CPLA provides the Plaintiffs with their exclusive remedy.    In response, the Plaintiffs contend their claims are not barred on the basis of the Connecticut Supreme Court's decision in *Gerrity v. R.J. Reynolds Tobacco Company*, 263 Conn. 120 (2003).   [Dkt. #55, p.2, 7].  However Plaintiffs' reliance on *Gerrity* is misplaced. *Gerrity* instructs that claims are not precluded by the exclusivity provision of the CPLA where plaintiffs seek a remedy for an injury that was not caused by the defective product.  The Connecticut Supreme Court stated that "the language of the exclusivity provision makes clear that the product liability act was intended to serve as the exclusive remedy for a party who seeks recompense for those injuries caused by a product defect. The language of the exclusivity provision, however, suggests that it was not designed to serve as a bar to additional claims, including one brought under CUTPA, either for an injury not caused by the

defective product, or if the party is not pursuing a claim for "personal injury, death or property damage...." *Gerrity*, 263 Conn. at 128.   Unlike the claims asserted by the Plaintiffs in this case,  "In *Gerrity,* the plaintiff's CUTPA claim was preserved because plaintiff alleged financial—not personal or property—injury based upon the increased cost of cigarettes that plaintiff had to pay as a result of defendant's wrongful conduct."  *Town of Sprague v. Mapei Corp.*, 3:11cv890, 11cv1033 (WWE), 2012 WL 1900120, at *2 (D. Conn. May 24, 2012) (citing *Gerrity*, 263 Conn. at 128).

Here, Plaintiffs seek damages for personal injuries caused by the allegedly defective ladder under their CUTPA claims.  *See* [Dkt. 1, Compl., p.14].  Because Plaintiffs have not brought a CUTPA claim for an injury that was not caused by the defective product as was the case in *Gerrity* and are clearly pursuing claims for personal injury, their claim do not fall within the exception enunciated in *Gerrity* and accordingly the exclusivity provision bars their claims.

Moreover, courts routinely hold that the CPLA's exclusivity provision bars CUTPA claims that "assert that a defendant's product is defectively designed or that the defendant failed to warn properly about a defective product."  *Fraser*, 857 F.Supp.2d at 258 (citing *Hurley v. Heart Physicians, P.C.,* 278 Conn. 305, 324, (2006)).   The Court therefore grants summary judgment on Plaintiffs' CUTPA claims as those claims are barred by the CPLA.  Even if Plaintiffs' CUTPA claims were not barred, there would be no genuine dispute as to any material fact for the reasons discussed above because Plaintiffs have not established a fact in dispute as to the ladder's defectiveness.  A reasonable juror could therefore not

conclude that the Defendants violated CUTPA by failing to warn about the defective ladder.

    **iv.**    **Loss of Consortium**

As Defendants argue, it is appropriate to grant summary judgment as to Plaintiff John Kuzmech's loss of consortium claim as it is a derivative claim. *Musorofiti v. Vlcek*, 65 Conn.App. 365, 375 (2001) ("Loss of consortium is a derivative cause of action, meaning that it is dependent on the legal existence of the predicate action."). Because the Court has granted summary judgment as to all the claims in the predicate action, Plaintiff John Kuzmech's loss of consortium claim also fails as a matter of law. The Court therefore grants summary judgment as to John Kuzmech's loss of consortium claim.

  <u>Conclusion</u>

For the foregoing reasons, the Court GRANTS Defendants' [Dkt. #57] motion to preclude and [Dkt. #45] motion for summary judgment. The Clerk is directed to enter judgment in favor of Defendants and close the case.

                                **IT IS SO ORDERED.**

                            _____*/s/*_____
                            **Hon. Vanessa L. Bryant**
                            **United States District Judge**

**Dated at Hartford, Connecticut: December [], 2012**